**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ronald TOBIN, Clifford Roger Ackerson, Defendants–Appellants.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ronald TOBIN, Defendant–Appellant.**

**Nos. 87–6015, 88–5274.**

United States Court of Appeals, Eleventh Circuit.

Feb. 21, 1991.

Samuel Burstyn, Robert F. Dunlap, Miami, Fla., for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., Edward C. Nucci, Linda Collins Hertz, Dawn Bowen, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON, COX, BIRCH and DUBINA, Circuit Judges, and HENDERSON *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This case arises from the district court's denial of co-defendants Ronald Tobin's and Clifford Ackerson's motions to suppress evidence seized in a search of Ackerson's home, garage, and a station wagon parked in the garage. A panel of this Court reversed the district court's finding that the search was permissible under the Fourth Amendment and held that Ackerson's motion should have been granted. The panel, however, affirmed the district court's denial of Tobin's motion, holding that Tobin did not have standing to contest the legality of the search. We vacated the panel's opinion and now affirm en banc the district court's denial of both motions to suppress.

## I. STATEMENT OF THE CASE

### A. *Factual Background*

The facts of this case are extensively reported in the panel's opinion. *United States v. Tobin*, 890 F.2d 319 (11th Cir. 1989), *reh'g granted and opinion vacated,*

---

\* Senior Circuit Judge Albert J. Henderson elected to participate in this decision, pursuant to 28 U.S.C.A. § 46(c).

902 F.2d 821 (11th Cir.1990). We therefore give only the following brief summary.

On March 19, 1986, two United States Customs agents and two Drug Enforcement Administration agents were conducting a surveillance unrelated to the instant case in a residential neighborhood in Miami. The agents watched the neighborhood from a field located northwest of the front of defendant Clifford Ackerson's house. Around 3:30 in the afternoon, one of the agents noticed a Mercury Marquis abruptly stop in front of Ackerson's house and back into the driveway. The agents began watching the activity through binoculars. Defendant Ronald Tobin got out of the car, looked around, ran to the front door, knocked, and was admitted within one minute. Shortly thereafter, Ackerson lifted the garage door three-quarters of the way up, looking up and down the street as he held the door. Tobin emerged and unlocked the trunk of the Mercury. He removed three clear plastic tubular bags, each approximately four feet long. According to one agent's testimony, smaller bundles were visible inside the bags. Tobin quickly put the bags in the garage. While the garage door was open, the agents observed a station wagon parked inside. A third vehicle, a pickup truck, was parked in the front yard.

Believing that the tubular bags contained cocaine, three of the agents decided to go to the door and talk to the occupants of the house. The fourth agent remained at the surveillance post. The three agents pulled up in front of the house in their individual unmarked vehicles. One went to the door; another accompanied the first as security backup; the third went to the corner of the house near the garage to stand out of sight.

The first agent knocked and received no answer. He continued knocking for three to four minutes, calling out in English and Spanish.[1] Ackerson opened the door. The agent showed him his credentials, told him he wanted to talk to him about the car in the driveway, and explained that he be-

lieved someone had put cocaine in his garage. Ackerson denied that anyone had recently backed into the driveway and stated that no one else was in his home. The agent smelled marijuana coming from inside the house as they spoke. Ackerson eventually called Tobin to the door. Tobin denied having driven the car there. When the agent explained all he had observed, Tobin continued to deny it.

The agent then told the two men that he thought they should all go to the garage and see what was there. Ackerson turned and walked inside the house in the direction of the garage. The agent followed him into the house. Tobin and the backup agent followed to the rear. When they got to the garage, the first agent asked Ackerson to open the outside garage door. He moved around the station wagon and opened it. The third agent, standing outside on the driveway, looked into the garage and spotted the tubular bags on the floor. One of the bags had been opened. The agent could see that it contained cocaine. The agents then placed Ackerson and Tobin under arrest. The agents did a security sweep of the house and discovered three bales of marijuana in the shower stall of the bathroom connected to the master bedroom. One of the agents also noticed through the windows of the station wagon in the garage that the screws had been removed from the floorplate over the wheel well in the rear of the vehicle. Upon opening the back of the vehicle and lifting up the wheel well cover, the agent found grocery bags full of cash, totalling $775,000.

### B. *Procedural History*
#### 1. *The District Court*

Ackerson and Tobin were charged with conspiracy and possession with intent to distribute cocaine in violation of 21 U.S.C.A. §§ 841(a)(1) & 846 and 18 U.S.C.A. § 2. Ackerson alone was charged with possession with intent to distribute marijuana in violation of 21 U.S.C.A. § 841(a)(1).

Both defendants filed motions to suppress the fruits of the searches. After

---

**1.** Though the district court did not make a specific factual finding as to what was said, the agent testified at the suppression hearing that

the words he used were, "I'm a police officer, I would like to talk to you, I need for you to come here."

holding a hearing on the motions, the magistrate recommended that the district court grant both motions to suppress, finding that the searches were illegal and that Tobin as well as Ackerson had standing to contest the searches.

After the government objected to the magistrate's report, the district court held a *de novo* hearing on the standing issue. The court subsequently entered an order denying both motions to suppress, holding that, based on the magistrate's findings, the search of the garage and protective sweep of the house were legal and that neither defendant had standing to contest the search of the station wagon because both had denied ownership of it. The court was thus not required to address Tobin's standing as to the house and garage, though it commented that the evidence adduced at the hearing did not support a finding that Tobin had a privacy interest in the house or garage to which Fourth Amendment protections could attach.

Tobin and Ackerson thereafter entered plea agreements with the government whereby they would both plead guilty to possession with intent to distribute cocaine, reserving the right to appeal the denial of their motions to suppress and to withdraw the guilty pleas if they prevailed. They subsequently pled guilty pursuant to the agreement. The court sentenced both defendants to terms of fifteen years in prison and fines of $100,000. Both defendants remained free on bond pending the appeal.

### 2. *The Panel*

The panel reversed the district court's denial of Ackerson's motion to suppress, but affirmed the denial of Tobin's motion. *Tobin*, 890 F.2d at 332. In the panel's view, the search of the house violated the Fourth Amendment. The panel noted that the magistrate and district court had found that the agents had reasonable suspicion of criminal activity when they approached the house.[2] This suspicion alone did not, in the panel's opinion, justify detaining and questioning the occupants under *Terry v. Ohio,*

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as the district court had opined, because *Terry* does not apply to dwellings. The key issue then, according to the panel, was whether the agent's conduct at the door of the house, which afforded him the opportunity to smell the marijuana, precipitated an impermissible search to which Ackerson did not consent.

The panel stated that a police officer's approach to a criminal suspect's house to make general inquiries is not a search as long as the door is not opened in response to a threat or command. *United States v. Knight,* 451 F.2d 275, 278 (5th Cir.1971), *cert. denied,* 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972). Because in its view the agent's conduct at the door amounted to a demand of entry under color of authority, however, the panel found the opening of the door to be a search to which Ackerson could not have consented. The olfactory access to the house which the agent gained pursuant to the opening of the door was therefore illegal. The searches which followed were consequently tainted. The panel also found, however, that Tobin did not have standing to assert the Fourth Amendment violation. Consequently, the evidence uncovered in the search was admissible against him.

### 3. *Rehearing En Banc*

Tobin then filed a petition for a rehearing and a suggestion for rehearing en banc on the standing issue. The government did not file a cross-petition. Ackerson, who had already obtained complete relief, did not join in Tobin's petition. On May 16, 1990, we vacated the entire panel opinion and granted rehearing en banc. At en banc oral argument, the parties argued both the issue of standing and the issue of the search's legality. It is not necessary to the outcome of this case, however, that we reach the standing issue. For the purposes of the following discussion, we assume, but do not hold, that the parties have standing to raise the question of the search's legality.

---

**2.** The magistrate described the agents' suspicion at this point as "more than mere suspicion, but less than probable cause."

## II. ANALYSIS

■ Review of a district court's denial of a motion to suppress evidence is a mixed question of law and fact. *United States v. Alexander*, 835 F.2d 1406, 1408 (11th Cir. 1988). The district court's findings of fact are reviewed under the clearly erroneous standard, whereas its application of the law to those facts is subject to *de novo* review. *Id.* In reviewing the district court's ruling, this Court must construe the facts in the light most favorable to the party prevailing below, *i.e.*, here the government. *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990).

■ The warrantless search of a home is "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). A warrantless search is allowed, however, where both probable cause and exigent circumstances exist. *United States v. Burgos*, 720 F.2d 1520, 1525 (11th Cir.1983).

### A. *The Agents' Approach to the House*
#### 1. *Probable Cause*

■ The magistrate and district court found that the agents had reasonable suspicion of criminal activity at the time they made their observations through binoculars from the field. Probable cause, in the district court's view, did not arise until the agent, while standing at the door, smelled the marijuana. The government did not contest this finding.

The question of what amounts to "probable cause is purely a question of law and hence is subject to plenary review by this court." *United States v. Hurtado*, 779 F.2d 1467, 1477 (11th Cir.1985). Probable cause exists when under the "totality-of-the-circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). In other words, probable cause exists "where the facts lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime.'" *United States v. Burgos*, 720 F.2d at 1525 (quoting *United States v. Rojas*, 671 F.2d 159, 165 (5th Cir. Unit B 1982)).

Prior to their approach to the house, the agents observed the defendants behave suspiciously, look about furtively, and quickly transfer into the garage tubular bags which contained smaller bundles. In view of these facts, the agents could reasonably have concluded that a search would uncover evidence of a crime. Because there was a "fair probability" that cocaine would be found in the garage, it appears that the agents had probable cause to search even prior to their approach to the house.

#### 2. *Exigent Circumstances*

■ To justify a warrantless search, however, there must also exist exigent circumstances in addition to probable cause. *Burgos*, 720 F.2d at 1525. This Circuit has held that the "presence of contraband without more does not give rise to exigent circumstances." *United States v. Torres*, 705 F.2d 1287, 1297 (11th Cir.), *vacated and remanded on other grounds*, 718 F.2d 998 (11th Cir.1983). An exigent situation may arise, however, when there is danger that the evidence will be destroyed or removed. *Burgos*, 720 F.2d at 1526. *See also United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir.) (listing several factors indicating existence of exigent circumstances), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2468, 95 L.Ed.2d 877 (1987). This Court has held that the need to invoke the exigent circumstances exception to the warrant requirement is "particularly compelling in narcotics cases" because narcotics can be so quickly destroyed. *United States v. Young*, 909 F.2d 442, 446 (11th Cir.1990). The test of whether exigent circumstances exist is an objective one. *Id.* "[T]he appropriate inquiry is whether the facts ... would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" *Id.* (quoting *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987)).

Prior to their approach to the house, the agents had probable cause to believe that narcotics were in the garage or the house and knew that at least two persons were in the house. They also knew that there were three vehicles on the premises, a fact which raises the possibility that there were more than two persons inside the house. The presence of the vehicles also permits the inference that the suspects might depart with or without the narcotics even before the agents could reach the house.

■ Circumstances are not normally considered exigent where the suspects are unaware of police surveillance. *Torres*, 705 F.2d at 1297; *United States v. Cravero*, 545 F.2d 406, 414–15 n. 24 (5th Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). This Circuit has held, moreover, that a warrantless search is illegal when police possess probable cause but instead of obtaining a warrant create exigent circumstances. *See United States v. Scheffer*, 463 F.2d 567, 575 (5th Cir.), *cert. denied*, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972); *see also United States v. Munoz–Guerra*, 788 F.2d 295, 298 (5th Cir.1986) (holding that where agents can get a warrant instead of revealing themselves and making immediate entry a foregone necessity, a warrantless search must be deemed unreasonable); *but see United States v. MacDonald*, 916 F.2d 766 (2d Cir.1990) (in holding a warrantless search valid where police had probable cause but precipitated the exigent circumstances by approaching the dwelling and knocking, the court stated, "The fact that the suspects may reasonably be expected to behave illegally does not prevent law enforcement agents from acting lawfully to afford the suspects the opportunity to do so. Thus, assuming arguendo that there were no exigent circumstances before the knock, the agents' conduct did not impermissibly create the circumstances occurring thereafter."). It should be noted, on the other hand, that "[l]aw enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish

probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966).

In the instant case, the agents could reasonably conclude from the defendants' hurried actions and furtive looks that the defendants were either aware or afraid that someone was watching them.[3] Destruction or removal of some portion of the narcotics was therefore a possibility. Construing the facts in a light most favorable to the government, the prevailing party below, it therefore appears that there existed exigent circumstances which would permit a warrantless search even prior to the approach to the house.

### B. *Approach to the House*

■ Assuming *arguendo* that the agents' observations considered in the totality of the circumstances did not immediately give rise to the necessary level of probable cause and exigent circumstances, the warrantless search should still be deemed justifiable. The district court, the panel, and all parties agreed that based upon the binocular observations, the agents had, at a minimum, reasonable suspicion that criminal activity was afoot. Reasonable suspicion cannot justify the warrantless search of a house, *see Arizona v. Hicks*, 480 U.S. 321, 328, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987), but it can justify the agents' approaching the house to question the occupants. *Knight*, 451 F.2d at 278; *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964) (stating "[a]bsent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.").

---

**3.** One of the agents did, however, state at the suppression hearing before the magistrate that he did not believe that the defendants noticed

him as he watched the activity through the binoculars at the surveillance post.

■ There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana.[4] *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir.1982). Moreover, the defendants and anyone else who might have been present in the house would have been aware of the agent's suspicions at that moment. Danger that the defendants or someone else inside the house might destroy the evidence thus provided the exigent circumstances required to justify a warrantless search. *Burgos*, 720 F.2d at 1526. Consequently, if the agents possessed only reasonable suspicion at the time of their observations and approached the house legally under *Knight* to speak with its occupants in order to dispel the suspicion, the search can be found illegal only if Ackerson's opening of the door was not consensual. *United States v. Edmondson*, 791 F.2d 1512, 1514 (11th Cir. 1986).[5]

■ The voluntariness of consent must be judged in light of the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). If the circumstances indicate that Ackerson opened the door in response to a "show of official authority," then Ackerson cannot be deemed to have consented to the agent's obtaining the olfactory evidence indicating the presence of marijuana. *Edmondson*, 791 F.2d at 1515. The relevant facts appear to be that the agent, with a backup officer standing behind him, knocked continuously for three to four minutes, calling out to the occupants. The agents were in plain clothes. Though they were armed, they did not display their weapons.

Whether the consent is deemed involuntary depends upon the amount of threat presented. On the one hand, cases in which police have used their position to demand entry have held that consent was not voluntary and thus have required suppression of evidence discovered pursuant to entry. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968) (holding that entry and search was not consensual when consent was given only after police stated that they possessed a warrant); *Edmondson*, 791 F.2d at 1515 (holding that entry was not consensual when consent was given only after agent with weapon drawn shouted, "FBI. Open up."). On the other hand, consent to enter has been held voluntary where the agent first telephoned and requested an interview, and the defendant agreed, subsequently opening the door when the agent knocked and identified himself by showing his credentials. *United States v. Willis*, 759 F.2d 1486, 1493 & 1498 (11th Cir.), *cert. denied*, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985).

The facts of the instant case fall much closer to those of *Willis* than those of *Bumper* or *Edmondson*. In calling out to the occupants of the house, the agent did not use the imperative as did the officer in *Edmondson*. On the contrary, he phrased his words in the form of a request. The occupants were free to deny that request or alternatively talk to the agent through the closed door. The decision to open the door was therefore voluntary. Consequently, Ackerson may be deemed to have consented to the agent's smelling of the marijuana which gave rise to the probable cause needed to do a warrantless search if that probable cause did not previously exist.[6]

---

4. The agent who first noticed the aroma of marijuana at the door testified at the suppression hearing that he had been in law enforcement for "[a]bout ten, eleven years." He had worked with the Customs Service for three years prior to the events involving this case. During the two years prior to these events, he had been involved in eleven narcotics seizures in the Miami area.

5. The district court did not have occasion to address the issue of consent. However, as the panel pointed out, where the record is adequate, the district court's failure to address the issue of consent does not prevent the appellate court from passing on it. *Tobin*, 890 F.2d at 328; *see also United States v. Newbern*, 731 F.2d 744, 748 (11th Cir.1984) (appellate court first to address consent issue).

6. The panel found the instant case analogous to the former Fifth Circuit case of *Pekar v. United States*, 315 F.2d 319 (5th Cir.1963). The panel's reliance on that case, however, was misplaced.

## C. *Searches Subsequent to Entry*

Because we find that warrantless entry into Ackerson's house justifiable, we hold the search of the garage and seizure of the cocaine to be permissible under the Fourth Amendment. Moreover, the protective sweep of the house subsequent to the arrests was also permissible. "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, — U.S. —, 110 S.Ct. 1093, 1099–1100, 108 L.Ed.2d 276 (1990). The fact that there were three vehicles on the scene coupled with Ackerson's lying about Tobin's presence clearly gave rise to a reasonable belief that someone else could be hiding in the house. The agents were, of course, free to seize any evidence they discovered in plain view within the proper scope of the protective sweep. *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) ("Where the initial intrusion that brings the police within plain view of [contraband] is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is ... legitimate."). Discovery and seizure of the marijuana in the shower stall was therefore legitimate.[7] Moreover, the search of the station wagon may be justified on the basis of the automobile exception. *United States v. Ross*, 456 U.S. 798, 807–808, 102 S.Ct. 2157, 2163–2164, 72 L.Ed.2d 572 (1982). The agent's sighting of the screws removed from the wheel well cover clearly gave rise to probable cause to believe the wheel well contained contraband. The evidence of exigent circumstances need not be overwhelming to justify the warrantless search of an automobile. *Alexander*, 835 F.2d at 1409. Both Tobin and Ackerson denied ownership of the vehicle, indicating to the agent that the true owner could have arrived and driven the vehicle away, thus depriving the government of evidence if the agent did not act immediately. *See id.*

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of Ackerson's and

---

There two FBI agents knocked on the door of the defendant's hotel room. When the defendant asked "Who is there?", the agents identified themselves and said they wanted to talk to the defendant regarding an FBI investigation. The defendant did not respond. The agents waited ten minutes and knocked again. The defendant asked for further identification. The agents displayed their credentials through a louvered door and were then admitted. The agents then conducted a full-blown search and twice tried to get the defendant to sign a consent to search form which the defendant refused to do. In holding the consent to enter and search involuntary, the court emphasized the defendant's refusal to sign the waiver and the agents' misleading the defendant into thinking they wanted to talk about an investigation perhaps unrelated to the defendant when they actually planned to search. *Id.* at 325. The panel's opinion thus distorted the *Pekar* court's reasoning by omitting discussion of these added factors.

The panel also found analogous *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). There officers smelled opium coming from a hotel room. The Court specifically stated that the officers at that point had probable cause. But instead of getting a warrant, the officers knocked, identified themselves, and said they wanted to talk. When the defendant opened the door, they immediately arrested her and conducted a search. The opinion states that entry was demanded and granted "under color of office," rather than "waiver of a constitutional right." *Id.* at 13, 68 S.Ct. at 368–69. However, it is clear from the context that the Court's objection to the warrantless arrest and search was that there were no exigent circumstances present justifying the lack of a warrant. *Id.* at 14–15, 68 S.Ct. at 369–70 ("No suspect was fleeing ... No evidence or contraband was threatened with removal or destruction."). Again, the panel opinion did not address this fact.

7. Testimony at the suppression hearing revealed that the agents also conducted a deeper warrantless search, looking into drawers and cabinets. The district court found this deeper search unjustifiable and suppressed the evidence it revealed. We agree with the district court's finding. *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969) ("There is no ... justification ... for routinely searching any room [incident to an arrest] other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under authority of a search warrant.").

Tobin's motions to suppress the evidence found pursuant to the search of the garage, house, and station wagon.

CLARK, Circuit Judge, dissenting with respect to the reversal of Ackerson's conviction and concurring with respect to the result in Tobin's conviction based on his lack of standing as found in the panel opinion, in which COX, Circuit Judge, and HENDERSON, Senior Circuit Judge, join:

The issues in this case have changed their complexion considerably since the district court ruled upon the motions to suppress filed by Tobin and Ackerson. That court held that neither Tobin nor Ackerson had standing to urge a Fourth Amendment right; alternately, if standing existed, the result would be the same since the facts supported a *Terry* stop. The court found that the facts supported a reasonable suspicion to believe that criminal activity was afoot and that this suspicion supported the officers' entry into the house.

The panel agreed with the district court that Tobin had no standing, but reversed with respect to Ackerson's standing since he owned and lived in the house the officers entered. Without discussing whether the officers had reasonable suspicion, the panel concluded that the officers' entry into the house was coerced and that Ackerson had not voluntarily consented to their entry. The district court's ruling denying Ackerson's motion to suppress was reversed.

The majority *en banc* opinion does not discuss standing. The majority decides that the entry into the house comported with Fourth Amendment law and that the ensuing search of the house by the officers was lawful. The district court's ruling not to suppress the evidence is affirmed. The majority holds that the activities of the defendants viewed by the officers through their binoculars supported a conclusion by the officers of probable cause to support a search of the house. The majority further reasons that there were exigent circumstances that excused the officers from the requirement that a warrant be obtained. The majority then assumes arguendo that there was no probable cause and reasons alternatively that the entry into the house by the officers was consensual.

Because I believe under the facts of this case there were no exigent circumstances except those created by the officers themselves, and because I believe the panel opinion was correct in holding that the entry by the officers was coerced, I respectfully dissent.

## I. EXIGENT CIRCUMSTANCES

Assuming arguendo that probable cause existed, that alone is not sufficient to justify a warrantless search; "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." [1]

The exigent circumstance exception invoked by the majority is that "[d]estruction or removal of some portion of the narcotics was ... a possibility." [2] The majority concedes that no evidence was introduced to show that the contraband was in danger of being destroyed, and indeed one agent testified that he did not believe that the officers had been observed during their surveillance. [3] Instead, the majority holds that the "imminent destruction" exception to the warrant requirement was triggered because the appellants acted clandestinely in transferring the packages of cocaine from the car to the garage. This holding contradicts both the facts of this case and previous case law.

The Supreme Court has repeatedly required the suppression of evidence seized without a warrant when there was no indication that the evidence was about to be destroyed. [4] The Court confronted very

---

1. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted).

2. Majority opinion, at 1511.

3. Majority opinion, at 1511 n. 3.

4. *See generally Minnesota v. Olson,* —— U.S. ——, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85 (1990) (approving Minnesota court's finding of no exigent circumstances for warrantless entry to arrest); *Mincey v. Arizona,* 437 U.S. 385, 390–95, 98 S.Ct. 2408, 2412–14, 57 L.Ed.2d 290 (1978) (no exigent circumstances to justify warrantless,

similar circumstances to those at issue in *Johnson v. United States.*[5] There, police officers were informed that unknown persons were smoking opium in a Seattle hotel. The officers entered a hallway and

recognized at once a strong odor of burning opium which to them was distinctive and unmistakable. The odor led to Room 1. The officers did not know who was occupying that room. They knocked and a voice inside asked who was there. "Lieutenant Belland," was the reply. There was a slight delay, some "shuffling or noise" in the room and then the defendant opened the door. The officer said, "I want to talk to you a little bit." She then, as he describes it, "stepped back acquiescently and admitted us." He said, "I want to talk to you about the opium smell in the room here." She denied that there was such a smell. Then he said, "I want you to consider yourself under arrest because we are going to search the room."[6]

From this, the Court held that no consent to search was given, and that no exigent circumstances justified the warrantless search:

No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not

enough to bypass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time will disappear. But they were not capable at any time of being reduced to possession for presentation to court.[7]

The majority circularly opines that *Johnson* is inapposite because, in that case, no exigent circumstances were present.[8] Yet here, as in *Johnson*, no reason beyond inconvenience has been proffered as to why a search warrant was not obtained. As in *Johnson*, no suspect was fleeing, likely to take flight, or even aware that there was any reason to flee. As in *Johnson*, the officers meant to search a permanent place of residence, not an automobile. And, as in *Johnson*, the evidence—four large, tubular bags of cocaine—was not threatened with removal or destruction. If appellants started to move the cocaine, the officers easily could have detected this through their surveillance and stopped the relocation. By all accounts, the appellants believed they had successfully secreted their cache in the garage, and there was no evidence that they were about to dispose precipitously of the goods. *Johnson* and the instant case are indistinguishable. The majority would hold, were it to decide *Johnson* today, that

four-day search of residence of arrested suspect); *Vale v. Louisiana,* 399 U.S. 30, 34–35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970) (arrest on steps in front of home did not create exigent circumstances for warrantless search); *Chapman v. United States,* 365 U.S. 610, 613–18, 81 S.Ct. 776, 778–80, 5 L.Ed.2d 828 (1961) (no exigent circumstances where officers searched rented-but-vacant property with permission of the owner); *Jones v. United States,* 357 U.S. 493, 497–500, 78 S.Ct. 1253, 1256–58, 2 L.Ed.2d 1514 (1958) (no exigent circumstances where evidence of ongoing illegal distilling operation perceived from outside dwelling); *United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951) (no exigent circumstances where police searched vacated hotel room; "There was no question of violence, no movable vehicle was involved, nor was there an arrest or imminent destruction, removal, or concealment of the property intended to be seized. In fact, the officers admit they could have easily prevented

any such destruction or removal by merely guarding the door."); *McDonald v. United States,* 335 U.S. 451, 454–56, 69 S.Ct. 191, 192–93, 93 L.Ed. 153 (1948) (no exigent circumstances where police had illegal gamblers under surveillance for two months); *Trupiano v. United States,* 334 U.S. 699, 709, 68 S.Ct. 1229, 1234, 92 L.Ed. 1663 (1948) (no exigent circumstances "where there was an abundant opportunity to obtain a search warrant and to proceed in an orderly, judicial way"); *Taylor v. United States,* 286 U.S. 1, 5–6, 52 S.Ct. 466, 467, 76 L.Ed. 951 (1932) (no exigent circumstances where odor alerted police to presence of alcohol in garage).

**5.** 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

**6.** 333 U.S. at 12, 68 S.Ct. at 368.

**7.** 333 U.S. at 15, 68 S.Ct. at 369.

**8.** Majority opinion, at 1512 n. 6.

the defendant was acting furtively by keeping her hotel room door shut.

As the majority discusses, prior decisions of the Supreme Court and of this court hold that exigent circumstances may arise when evidence is likely to be destroyed. Regardless of the ease of destructibility of evidence, if there is no indication that evidence is in danger of being lost, there is no reason for the police to circumvent the Fourth Amendment's warrant requirement. The most delicate scintilla of evidence will last indefinitely if no one has an incentive to destroy it. In the circumstances of this case, the appellants would have been most loathe to destroy their extremely valuable store of cocaine and money absent some evidence known to them of police surveillance.

Where suspects are unaware of police surveillance, the majority correctly notes that exigent circumstances do not usually exist.[9] For example, in *United States v. Torres*,[10] the police searched a house, the entrance of which was strewn with marijuana leavings; a van parked nearby contained bales of marijuana. The court found no exigent circumstances, however, because

> [t]he presence of contraband without more does not give rise to exigent circumstances. It is improbable that the appellants could have concealed or destroyed the 200 pounds of marijuana found in the house before the agents moved in. Had appellants attempted such a course of action exigent circumstances would have been presented. The agents, however, had no reason to speculate that the evidence was being destroyed or that it was even subject to that risk.[11]

The logical corollary of the notion that exigent circumstances do not exist where suspects are unaware of surveillance is that such circumstances do not exist where the police purposefully make suspects aware of surveillance. Clearly, the police involved in this case controlled the time at which the approach to the house took place, thus creating the exigent circumstances for their search.[12]

In evaluating the creation of exigent circumstances by police, courts in the past have looked to whether there was an opportunity to obtain a search warrant. In *United States v. Scheffer*,[13] this court wrote that "we have carefully reviewed the record and there is simply no plausible explanation as to why customs officials failed to go before a magistrate and obtain a search warrant."[14] As the majority notes, the *Scheffer* court found that police creation of exigent circumstances cannot excuse the failure to obtain a warrant. In *United States v. Munoz–Guerra*,[15] this court's twin circuit held that incriminating evidence must be suppressed when police, having received a tip that an armed drug dealer lived in a certain condominium, created exigent circumstances by approaching a door of the residence. The Fifth Circuit wrote,

> In the instant case, it was possible to secure the condominium covertly from the outside. There was no basis, on these facts, for believing that resort to a magistrate would have created risks of a greater magnitude than those which are present in any case where the police have probable cause but delay entry pending receipt of a warrant. Had the police's necessary efforts to secure the premises

**9.** Majority opinion, at 1511.

**10.** 705 F.2d 1287 (11th Cir.), *vacated and remanded on other grounds,* 718 F.2d 998 (11th Cir.1983).

**11.** *Id.* at 1297.

**12.** *See United States v. Duchi,* 906 F.2d 1278 (8th Cir.1990) (holding that evidence must be suppressed where the police created the exigency that the suspect would open a tampered package and immediately destroy the evidence); *United States v. Thompson,* 700 F.2d 944, 950 (5th Cir. 1983) (government cannot create exigent cir-

cumstances) (citing cases); *United States v. Scheffer,* 463 F.2d 567, 575 (5th Cir.) (no exigent circumstances where "agents ... actually planned the cocaine transfer and could have controlled the time at which it took place."), *cert. denied,* 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972).

**13.** 463 F.2d at 567.

**14.** *Id.* at 575.

**15.** 788 F.2d 295 (5th Cir.1986).

been visible to the inhabitants or had there been reason to believe that someone within the condominium was in need of immediate succor, the government's position would have merit.[16]

After the agents knocked on the door of Ackerson's home, the agents had to search the house, with or without consent, or risk the possible destruction of the evidence. As the *Munoz–Guerra* court commented:

> [The agents] knew when they knocked on the patio door that, once having made their presence known to Munoz–Guerra (and possibly to other occupants) it would be necessary to conduct a security search of the premises and to restrain the condominium's inhabitants. Warrantless entry was thus a foregone conclusion the instant the agents revealed themselves to Munoz–Guerra at the patio door.[17]

The constitutional error in this case is magnified by the ease with which the agents could have complied with the Fourth Amendment's warrant requirement, assuming as the majority does that there was probable cause. The agents clearly had the option of unobtrusively securing the boundaries of the house while a warrant was procured—one of the agents testified that they were in possession of a two-way radio at the time of the search.[18] The Federal Rules of Criminal Procedure authorize the issuance of telephonic warrants.[19] If any of the suspects left prior to the issuance of the warrant, they could have been detained, and if they possessed any of the contraband, arrested.[20] And if some of the suspects were arrested and others remained in the house, that would have provided the exigent circumstances necessary to trigger an exception to the warrant requirement.

The Supreme Court has held that "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."[21] Given that the suspects were completely unaware of the surveillance, the police have failed to carry their burden of showing the existence of such an urgent need.

## II. NONCONSENSUAL ENTRY

Barring exigent circumstances, the police may conduct a warrantless search of a residence only when they have the freely given consent of the occupants. The Supreme Court in *Bumper v. North Carolina*[22] held that "[w]here there is coercion there cannot be consent,"[23] and "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."[24] The government's burden should be particularly heavy since "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."[25]

Without consent, the agents would not have gained access to Ackerson's house for any justifiable purpose and their entry would amount to a search.[26] With reason-

---

**16.** *Id.* at 298; *see also United States v. Curzi,* 867 F.2d 36, 43 (1st Cir.1989) (invalidating warrantless search involving creation of exigent circumstances analogous to those in *Munoz–Guerra* ).

**17.** 788 F.2d at 298.

**18.** Record on Appeal, vol. 4, at 26.

**19.** *See* Fed.R.Crim.P. 41(c)(2); *see also United States v. Cuaron,* 700 F.2d 582, 588–89 (10th Cir.1983) (court must consider availability of telephonic warrant in exigent circumstances determination).

**20.** *See Segura v. United States,* 468 U.S. 796, 809–10 & n. 7, 104 S.Ct. 3380, 3387–88 & n. 7, 82 L.Ed.2d 599 (1984) (Burger, C.J., & O'Connor, J.) (commenting favorably on the practice of securing the boundaries of a home while obtaining a warrant to search).

**21.** *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984).

**22.** 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

**23.** 391 U.S. at 550, 88 S.Ct. at 1792.

**24.** 391 U.S. at 548, 88 S.Ct. at 1792 (footnote omitted).

**25.** *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972).

**26.** *See United States v. Vicknair,* 610 F.2d 372, 377 (5th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980).

able suspicion, however, an officer may legally approach the house of a criminal suspect in order to make general inquiries.[27] As long as the door is not opened in response to a threat or a command, the actions of the agents are considered part of an investigation and not a "search." Thus, if the agents merely requested to speak with the occupants of the house and Ackerson opened the door in compliance, no search occurred at that point and any contraband detected by the agents' olfactory access into Ackerson's home was lawfully obtained under the "plain view" doctrine.[28] The testimony of the agents involved in the instant search shows that the government has failed in its burden of demonstrating free and voluntary consent.

Three federal drug enforcement agents parked their vehicles in front of appellant Ackerson's house. A fourth agent remained at some distance as a precautionary measure. Special Agent Glendell Wayne Roberts was designated to knock on the door of the residence and communicate with the occupants. Agent O'Neil accompanied him.[29] Roberts was dressed in civilian clothes and had his hand on his holstered gun at this time.[30] He stated:

> I knocked on the door, and at first, no one would answer the door. I knocked, I continued to knock, on the door, and I stated—I announced I was the police, that I wanted to talk. I said, "I'm a police officer, I would like to talk to you, I need for you to come here."

> I said it in English and Spanish because we were working with a group of Colombians at the time.[31]

A third officer, Special Agent Steven K. Widener, was standing at the side of the house with his gun drawn, observing the proceedings.[32] Widener's testimony was as follows:

> I could hear Agent Roberts shouting, "Police officers! We want to talk to you!" He said it several times, both in English and in Spanish.

>    *    *    *    *    *    *

> For a short period of time, I would say about three maybe four minutes, there was absolutely no response. We knew someone was in the house because we'd just seen them go in. We'd never taken our visual off of the house.

> I was preparing to go to my car radio and all [sic] for assistance, backup, a uniformed officer to come to assist us and, at that time, at the same moment, the door opened. I heard the door open. I heard Agent Roberts in a dialogue with someone at the front door.[33]

The agents in this case demanded entry under "color of authority." Magic words of demand, such as "open-up," are not necessary to constitute coercion. Rather, it is the actions of the officers and the context in which the words are spoken that dispose of the issue.[34] Agent Roberts knocked and shouted for three to four minutes that he was a police officer and that he needed the appellants to come to the door. These actions do not, under the totality of the circumstances, amount to a request. The knocking was too long and too adamant to put Roberts in the category of any other public member asking for entry. Furthermore, Ackerson never verbally agreed to allow the agents to enter or to search the garage. Ackerson's actions in this regard further support the idea that Ackerson was reacting to the agents rather than consenting.[35] Because the agents demanded entry

---

27. *United States v. Knight,* 451 F.2d 275, 278 (5th Cir.1971), *cert. denied,* 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed.2d 240 (1972); *Davis v. United States,* 327 F.2d 301, 303 (9th Cir.1964).

28. *Coolidge v. New Hampshire,* 403 U.S. 443, 465–71, 91 S.Ct. 2022, 2037–41, 29 L.Ed.2d 564 (1971).

29. Record on Appeal, vol. 6, at 11.

30. Record on Appeal, vol. 4, at 62.

31. *Id.* at 27.

32. Record on Appeal, vol. 6, at 32.

33. *Id.* at 12.

34. *See United States v. Walters,* 591 F.2d 1195, 1200 (5th Cir.) ("request" that appellant follow agent was no more than rhetorical question), *cert. denied,* 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979).

35. *Cf. Johnson,* 333 U.S. at 12, 68 S.Ct. at 368 (defendant "stepped back acquiescently"); *Pekar v. United States,* 315 F.2d 319, 325 (5th Cir.1963) (defendant seemed "confused").

under color of authority, they effected an unconstitutional search of Ackerson's house when they gained olfactory access through the open door.

Under the "totality of the circumstances" test enunciated by *Schneckloth v. Bustamonte*,[36] the search was far from consensual. The Court wrote, "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions...."[37] The Court also commented,

> [T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.[38]

In this case, the "subtly coercive" circumstances included: the sudden appearance of three unmarked cars in the front of the house; one agent at the side of the house with his gun drawn; two armed agents standing at the front door; one agent rapping on the door for several minutes while shouting that the police were outside and that he wanted to talk to the occupants; and then the same agent asking a number of accusatory questions. Of course under these circumstances Ackerson and Tobin did not verbally or physically bar the agents from coming in; the agents' actions clearly *implied* that the full force of the government would be brought to bear upon the residents of the house if the door was not opened and the garage was not allowed to be searched. Taking all of the circumstances together, Roberts' request was a command and Ackerson's consent was coerced.

The majority fails adequately to distinguish *Pekar v. United States*.[39] The facts in that case are very similar to those at issue:

Upon arrival outside defendant's room, [the agents] knocked. Defendant answered, "who is there?" to which [Agent] Beale replied, "I want to talk to you regarding an official investigation of the F.B.I." The defendant declined to answer, and the agents waited outside the door for 10 minutes, and again asked the same questions. The defendant asked how he would know that they were from the F.B.I., and the agents presented their identification through the louvers of the outer louvered door, there being double doors to defendant's room. He then asked for more proof, and Beale gave him the telephone number of the F.B.I. office and told him to call, but to the knowledge of Beale, the defendant did not call. Then the defendant opened the door and the agents walked in displaying their credentials.[40]

The court then found that the defendant was coerced into admitting the agents, in that the door was opened only in the wake of the agents' persistent efforts, and "[t]he agents merely told defendant when he asked what they wanted that they wanted to talk to him about an investigation not that they wanted to search his room."[41] As in *Pekar*, in the instant case the federal agents only gained entry through their persistence—repeatedly knocking on the door while shouting "Police Officers!" The doors in both cases were opened on misleading pretenses. In the instant case, the officers claimed that they wanted to *talk* to the residents about the unloading operation they had observed; they never indicated that what they really wanted to do was to *search* the house. Only a very active imagination could imply consent to search under these circumstances.

The majority distinguishes *United States v. Edmondson*,[42] by noting that there, the officer's command was an imperative, while in this case, Agent Roberts testified that he requested to speak with the occu-

36. 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

37. 412 U.S. at 229, 93 S.Ct. at 2049.

38. 412 U.S. at 228, 93 S.Ct. at 2048.

39. 315 F.2d at 319.

40. *Id.* at 323.

41. *Id.* at 325.

42. 791 F.2d 1512 (11th Cir.1986).

pants. *Edmondson*'s facts are not so easily distinguishable:

> After consulting an FBI legal advisor, the decision was made to knock on the door in an attempt to determine the identity of [a suspect]. The agents did not have a search nor arrest warrant. With weapons drawn, and with the vicinity in front of the apartment surrounded, the agents knocked on the door and saw Edmondson look out of the window. At this point, an agent yelled, "FBI. Open the door." Edmondson opened the door, stepped back, and placed his hands upon his head.[43]

Our court found that Edmondson's act in stepping out of the door, hands on his head, did not amount to an implied consent to be arrested. The court did not base this holding on the fact that the agent told Edmondson to open the door; rather, it held that "his consent to the entry into his residence [was] prompted by a show of official authority."[44]

The majority likens the consent given in this case to that given in *United States v. Willis*.[45] The circumstances of that case bear out the poverty of the analogy. In *Willis*, an officer telephoned a hotel room whose occupants were under investigation. "A man answered, and Park identified himself as a police officer, explaining he was next door and wanted to talk face to face. The person in Room 222 said 'Okay.' [The officers] then knocked, and a man ... opened the door."[46] The events in *Willis* were quite similar to those that are present when any private citizen requests permission to visit. And the defendant even gave an explicit verbal authorization for the police entry. But no normal neighbor (or constitutionally sanctioned police officer) bangs on the door for minutes, shouts his authority for demanding an audience, and then enters without receiving permission.

When the government does not first seek a warrant, it has the burden of showing that a free and voluntary consent was given to search a home. As related by the government's own witnesses, the facts here show that no such consent was given. As the Supreme Court noted over a century ago,

> [i]t may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.[47]

It follows that this court should construe the Fourth Amendment to require the suppression of evidence derived from the coerced "consent" given in this case.

## III. CONCLUSION

Respectfully I submit that the majority errs in holding that the officers' warrantless search of Ackerson's house was justified by the exigent circumstances exception to the warrant requirement. Further, the majority finds a consensual search under circumstances not heretofore condoned by any court. I would reverse the district court's denial of Ackerson's motion to suppress.

---

**43.** *Id.* at 1514.

**44.** *Id.* at 1515.

**45.** 759 F.2d 1486 (11th Cir.), *cert. denied*, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985).

**46.** *Id.* at 1493.

**47.** *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).